**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DANIEL CONWAY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 18-14919 (SRC) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CONNECTONE BANKCORP, INC. and | : | |
| ROBERT MURPHY, | : | |
| | : | |
| Defendants. | : | |

**CHESLER, U.S.D.J.**

This matter comes before the Court on two motions for summary judgment, pursuant to FED. R. CIV. P. 56: 1) the motion by Plaintiff Daniel Conway; and 2) the motion by Defendants ConnectOne BankCorp, Inc. and Robert Murphy (collectively, "Defendants.")   For the reasons set forth below, Plaintiff's motion will be denied, and Defendants' motion will be granted.

This case arises out of a dispute between an employer, Defendant ConnectOne BankCorp, Inc. (the "Bank"), and an employee, Plaintiff Daniel Conway ("Conway").   On September 13, 2018, Plaintiff filed the Complaint in the Superior Court of New Jersey.   The Complaint also named as a Defendant Robert Murphy ("Murphy").   On October 12, 2018, Defendants removed the case to this Court.

The Complaint contends, in brief, that Plaintiff was entitled to leave pursuant to the Family and Medical Leave Act ("FMLA") and New Jersey Family Leave Act ("NJFLA"), that

1

Defendants interfered with his leave rights, and then terminated his employment in retaliation for his requests for leave.   The Complaint asserts four claims against both Defendants: 1) interference with FMLA rights; 2) retaliation for FMLA leave requests; 3) interference with NJFLA rights; and 4) retaliation for NJFLA leave requests.   The Complaint alleges that Murphy is the managing director of the Bank.   The parties agree that Alexis Manning ("Manning") is a Human Resources Administrator at the Bank and Elizabeth Magennis ("Magennis") served as the Executive Vice President Chief Lending Officer at the Bank.   The parties also agree that Plaintiff worked for the Bank as a Senior Vice President in Commercial Lending from March of 2016 until he was terminated on May 11, 2018.   There is no dispute that Plaintiff's wife underwent emergency surgery, following an accident, in March of 2017 (the "First Surgery"), and then a surgery in December of 2017 (the "Second Surgery.")

This Court now considers the motions for summary judgment filed by each side.

## LEGAL STANDARD

Summary judgment is appropriate under FED. R. CIV. P. 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).   A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"   Marino v. Indus. Crating Co., 358 F.3d

2

241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."   In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."   Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.   Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).   The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.   Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).   "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."   Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).   "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."   Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).   "In reviewing the record, the court must give the nonmoving party the benefit of all reasonable inferences." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995).

3

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

## DISCUSSION

In writing the sections of the briefs on the interference claims, both parties have often blurred the distinction between two subtypes of interference claim that are distinguishable under Third Circuit law, sometimes confusing one with the other.   One subtype has been decided under a five-element standard, as stated in Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014); this Opinion refers to this subtype as a "denial of benefits" interference claim.   The other subtype, which Third Circuit cases have termed a "failure to advise" interference claim, has been decided under a very different standard, as stated in Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004).   Although the legal standards for both subtypes contain essential elements involving "notice," the element of notice in each of the two subtypes is totally different, and it is essential to be careful about this distinction in discussing the motions presently before this Court.

Plaintiff has moved for summary judgment on Count One (FMLA interference) and Count Three (NJFLA interference).[1]   Defendants have moved for summary judgment on the

---

[1] While the title page of Plaintiff's brief states that the motion seeks summary judgment on counts one through four, the brief itself addresses only Count One and Count Three.

4

interference claims as well as the retaliation claims.   This Opinion is organized by issue, dealing

first with the two subtypes of interference claims, followed by the retaliation claims.

The parties agree that the relevant federal and state statutes are very similar, and that

courts apply the same standards and framework to claims under the FMLA and the NJFLA.[2]

## I.   The "denial of benefits" interference claims

Both Plaintiff and Defendants have filed motions for summary judgment as to the

interference claims under a "denial of benefits" theory.

The principal case cited by Plaintiff for his "denial of benefits" claim, Parker v.

Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 483 (D.N.J. 2002), states the following standard:

> To present a claim under the FMLA, a plaintiff must show (1) she is an eligible
> employee under the FMLA, (2) defendant is an employer subject to the
> requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she
> gave notice to the defendant of her intention to take FMLA leave, and (5) the
> defendant denied her the benefits to which she was entitled under the FMLA.

Parker correctly states the Third Circuit standard applicable to a "denial of benefits" claim.   See,

e.g., Ross, 755 F.3d at 191-92 (applying the same standard).   Plaintiff's brief, however,

misstates the holding in Parker.   While Parker requires a plaintiff to demonstrate that plaintiff

"gave notice to the defendant of her *intention* to take FMLA leave," Plaintiff's brief asserts that

Parker requires that Plaintiff "gave notice to Defendant ConnectOne of a *need* to take

FMLA/NJFLA leave."   (Pl.'s MSJ Br. at 8.)   Plaintiff does not acknowledge the difference, and

the change of one word from "intention" to "need" is a material one.   Plaintiff makes no case

that these words have the same meaning, nor that his version is a correct formulation of the

---

[2]  Because of this agreement, this Opinion states all analyses and determinations in terms of the
federal statute, and the corresponding determination under the state statute is implicit.

fourth element of an FMLA interference claim under Third Circuit law.   Plaintiff's brief has stated the wrong standard for a "denial of benefits" interference claim.

      This is also highlighted by another case that Plaintiff cites, <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 402 (3d Cir. 2007), in support of the proposition that "a 'liberal construction' should be given to FMLA's notice requirement."   (Pl.'s MSJ Br. 12.)   <u>Sarnowski</u> is a "denial of benefits" case.   The <u>Sarnowski</u> Court squarely considered the legal question that is at issue as to Plaintiff's "denial of benefits" claim: the appeal centered on a dispute over "whether the notice [plaintiff] did provide was legally sufficient to entitle him to benefits under the FMLA."   510 F.3d at 402.   The Third Circuit discussed the text of both the statute and the relevant Regulations.   <u>Id.</u> at 401-402.   Next, the Third Circuit considered relevant cases from the appellate courts of other circuits.   <u>Id.</u>   The Third Circuit then held:

> In providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee *seeks leave* under the FMLA.

<u>Id.</u> (italics added).   <u>Sarnowski</u> thus teaches that the critical question is whether the employee conveyed adequate information to the employer that the employer could reasonably interpret to understand that the employee seeks leave – and, by "seeks leave," the Third Circuit meant "has intent to take leave:"

> We have concluded that, when the facts are viewed in the light most favorable to Sarnowski, Air Brook had sufficient notice of Sarnowski's intent to take leave to bar Air Brook from interfering with Sarnowski's rights under the FMLA.

<u>Id.</u> at 403.   The Third Circuit law on this issue is clear: to succeed on a "denial of benefits" interference claim, the employee must have conveyed adequate information to the employer that

the employer could reasonably interpret to understand that the employee intends to take leave. "The FMLA does not require an employer to be clairvoyant." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 303 (3d Cir. 2012) (quoting Brenneman v. MedCentral Health Sys., 366 F.3d 412, 428 (6th Cir. 2004)).

Plaintiff, however, has argued his interference claims based on the proposition that, for Plaintiff to have given legally sufficient notice, he must have given notice to Defendant of a need to take FMLA/NJFLA leave; Plaintiff entirely ignores that the Third Circuit standard requires "notice to the defendant of his or her intention to take FMLA leave." Ross, 755 F.3d at 192. This Court rejects Plaintiff's formulation of the fourth element as erroneous under Third Circuit law. As Defendants argue, "Plaintiff attempts to conflate notice of his wife's surgeries with a request for a leave of absence." (Def.'s MSJ Reply Br. at 1.) That Plaintiff may have given notice of his wife's surgeries does not in and of itself satisfy the requirement that he convey that he intends to take leave.

Plaintiff's brief thus argues entitlement to judgment as a matter of law under a materially incorrect formulation of the law of "denial of benefits" claims. Plaintiff's arguments that the evidence supports a finding that he gave notice to Defendants of a *need* to take FMLA leave miss the mark. At this point, as to the law of "denial of benefits" claims, Plaintiff's fatal legal error has been established clearly: he has misread Parker, which states the correct standard, and several subsequent controlling Third Circuit cases, such as Sarnowski and Ross, clearly state the correct standard.[3] Having determined this, the Court finds that Plaintiff's remaining arguments

---

[3] Plaintiff points to a number of places in the cases and in the Regulations in which language about the employee's *need* for leave is used in the context of the notice requirement. Plaintiff, however, does not, and cannot reasonably, argue that these change the language in the FMLA

about the fourth element of his claim for FMLA interference under Third Circuit are not more than arguments that the Third Circuit got it wrong; this Court need not labor to parse them.[4] Plaintiff's arguments are preserved for appeal, where he may argue that his version of the standard is equivalent to the Third Circuit's.

_____

statute that requires notice of the employee's *intention* to take leave.   Although Plaintiff never articulates this, it seems at times that Plaintiff wants an interpretation of "notice of intention to take leave" that means "notice of life circumstances that would lead a reasonable employer to consider that leave might be beneficial to the employee."   As already noted, "[t]he FMLA does not require an employer to be clairvoyant."   Lichtenstein, 691 F.3d at 303.

[4] For example, Plaintiff cites a provision of the FMLA statute, 29 U.S.C. § 2612(e)(2), in support of this assertion: "As to the fourth element, to invoke one's rights under the FMLA, one must provide adequate notice to their employer about the need to take leave."   (Pl.'s MSJ Br. at 12.)   That statutory provision states:

> (2) Duties of employee. In any case in which the necessity for leave under subparagraph (C) or (D) of subsection (a)(1) or under subsection (a)(3) is foreseeable based on planned medical treatment, the employee—

> > (A) shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee or the health care provider of the son, daughter, spouse, parent, or covered servicemember of the employee, as appropriate; and

> > (B) shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

29 U.S.C. § 2612(e)(2).   Plaintiff has mischaracterized the law.   Plaintiff argues that the statute requires adequate notice of the *need* to take leave, but the express language of this provision requires something different: adequate notice of the employee's *intention* to take leave.   It appears that the wording of the relevant Third Circuit standard accurately tracks the language of the FMLA statute.   Plaintiff's remaining arguments about the fourth element meet similar fates and, in short, Plaintiff fails to persuade this Court that the Third Circuit has misinterpreted the statute and relevant Regulations.

Although Plaintiff incorrectly stated the Third Circuit standard applicable to a claim for FMLA interference under a "denial of benefits" theory, this Court will consider the evidence assembled by Plaintiff in the motion under the correct legal standard.   The decision turns on the fourth element of the Ross standard, and the question at issue is this: has Plaintiff offered evidence from which a reasonable jury could conclude that Plaintiff gave notice to the defendant of his *intention* to take FMLA leave?

To answer this question, the Court looks to the subsection of Plaintiff's brief that addresses the notice Plaintiff provided to Defendants.   That subsection contains only one paragraph in which Plaintiff musters the evidence, here quoted in its entirety:

> Here, Defendants' admissions conclusively prove that Plaintiff provided Defendants with sufficient notice to trigger Defendants to inform him of his right to take protected leave to care for his wife. Defendant Murphy and Ms. Manning both admitted at their depositions that they understood that Plaintiff's wife had emergency neck surgery in March 2017 and that Plaintiff needed to help care for her. Specifically, Defendant Murphy admitted at deposition that Plaintiff had informed him of the surgery and further admitted to receipt of text messages and emails from Plaintiff regarding his need to be in the hospital with his wife as well as his need to be at home caring for his wife. See SOF ¶¶ 42-54. Ms. Manning, an Administrator in Defendants' Human Resources Department, whose job duties included administering protected leaves for Defendants' employees, also admitted that she received in email from Plaintiff in early April 2017, approximately a week and a half after his wife's surgery, informing Ms. Manning of his wife's surgery. See SOF ¶¶ 55-60. In fact, Plaintiff's email to Ms. Manning specifically stated "…my wife had emergency [neck] surgery and I have been scatter brain the last two weeks…". See SOF ¶¶ 57-59. Defendant Murphy further admitted that he was aware in December 2017 that Plaintiff's wife had a second surgery also requiring Plaintiff to care for her. See SOF ¶¶ 88-91.

(Pl.'s MSJ Br. 13.)   The only sentence in this paragraph that deals with Plaintiff's communications to his employers in March of 2017 is this one:

> Specifically, Defendant Murphy admitted at deposition that Plaintiff had informed him of the surgery and further admitted to receipt of text messages and emails from Plaintiff regarding his need to be in the hospital with his wife as well as his

9

need to be at home caring for his wife.

The brief cites to paragraphs 42 through 54 in Plaintiff's Rule 56.1 Statement, and the content of this sentence is supported by the evidence cited in the Rule 56.1 Statement: the evidence cited tends to show that Plaintiff informed Murphy about his wife's surgery, as well as his need to be in the hospital with her and at home after it.   Defendants' Responsive Rule 56.1 Statement states that the characterizations of the evidence in Plaintiff's Statement's paragraphs 45 through 54 are admitted.   As to paragraphs 42 through 44, Defendant's objections are inconsequential.

Thus, the Court finds that the evidence of record supports Plaintiff's contention that, as to the events surrounding the First Surgery, of March, 2017, Defendant Murphy admitted that Plaintiff had informed him of his wife's surgery and Plaintiff's need to be in the hospital and at home afterward.   This evidence, however, does not support the inference that Plaintiff gave notice to his employer of his intention to take leave in relation to the First Surgery.   As to the First Surgery, Plaintiff has presented no evidence that could persuade a reasonable jury to find in his favor on the fourth element of his denial of benefits FMLA interference claim.

Moreover, Plaintiff has not only offered no evidence that would support a jury determination in his favor as to the fourth element; as to the First Surgery, he has offered evidence which is *adverse* to a finding in his favor.   While the brief does not mention this evidence, Plaintiff's Rule 56.1 Statement does: paragraph 52 cites exhibit M, which is a copy of an email dated April 3, 2017 from Plaintiff to Murphy.   (McKinney Aff. Ex. M.)   The body of this email begins: "I am still working from home, as my wife continues to recover."   (Id.)   The remainder of the email appears to be a status update on various business projects Plaintiff was working on, with comments about Plaintiff's plans for his future actions on each project.   (Id.)

The Court recognizes that this email does not appear to contain any statements about what Plaintiff communicated to his employer at the time of his wife's surgery.   Nonetheless, it is evidence that, instead of communicating to his employer a need for a leave of absence, it instead communicated his intention to continue to work at home while his wife recuperated.   Thus, Plaintiff does not cite evidence which supports a finding in his favor on the element of notice of intent to take leave, but does cite evidence that is potentially adverse to a jury determination in his favor.

As to the Second Surgery, the subsection of Plaintiff's brief on the fourth element contains only one sentence, the final sentence in the paragraph quoted above.   The evidence that Murphy knew that Plaintiff's wife had a second surgery, and needed Plaintiff to care for her, as alleged in the brief, says nothing about the question at issue: did Plaintiff give notice to the Defendant of his intention to take FMLA leave?   Nor does Plaintiff's Rule 56.1 Statement make any assertions that could lead a reasonable jury to find in Plaintiff's favor as to the element of notice of an intention to take leave.   To the contrary, the Rule 56.1 Statement points to highly relevant evidence that is adverse to Plaintiff's case.   Paragraph 88 cites a portion of Plaintiff's deposition transcript, which includes these exchanges:

> Q. Okay. So you – you e-mailed Bob about the second surgery, the hernia and breast reduction surgery?
> A. I don't remember specific e-mail. I know we talked about it.
> . . .
> Q. And what did you tell him about the breast reduction and the hernia surgery?
> A. I told her that – I told him that, as a result of the neck surgery, this was being recommended. The - I think they consulted with the spine surgeon. He agreed. And that there would be a significant recovery time.   Similar to the first, it was - I don't remember the exact amount of time. But it was several weeks.
> Q. Okay. And did you tell him what your plan was for that period of time as far as work was concerned?
> A. I told him that this is what was happening, that I would work from home.

(Conway Dep. at 138:8-12, 138:18-139:7.)   This testimony does not support a finding that Plaintiff gave notice of an intention to take leave.   To the contrary, it is strong evidence that Plaintiff told Murphy, in regard to the Second Surgery, that he would work from home.   This evidence supports the conclusion that Plaintiff gave notice of his intention to work from home, which is adverse to his case.   As to the Second Surgery, Plaintiff has presented no evidence that could persuade a reasonable jury to find in his favor on the fourth element of his FMLA interference claim.

Plaintiff bears the burden of proof at trial of every element of his "denial of benefits" interference claims.   As to the fourth element of his "denial of benefits" interference claims, with regard to both the First Surgery and the Second Surgery, Plaintiff has failed to make the affirmative showing required to prevail at trial under Third Circuit law.   Plaintiff's motion for summary judgment as to his "denial of benefits" interference claim must be denied.

Defendants move for summary judgment on the "denial of benefits" interference claims on the ground that Plaintiff cannot prove the element of notice, the fourth element in the Lichtenstein/Sarnowski five-part test.   Defendants point to the Third Circuit's statements in Lichtenstein about the principles courts should apply in considering the sufficiency of notice:

> [T]he "critical test" is not whether the employee gave every necessary detail to determine if the FMLA applies, but "how the information conveyed to the employer is reasonably interpreted." *Sarnowski*, 510 F.3d at 402. How the employee's notice is reasonably interpreted is generally a question of fact, not law.

Lichtenstein, 691 F.3d at 303.   The decision then has a footnote, which states:

> There are cases, of course, where the undisputed facts are such that no rational trier of fact could conclude that the employee's notice was adequate.   In such cases, the adequacy of notice can be determined as a matter of law.

12

Id. at 303 n.14 (citation omitted).   Defendants contend that this footnote describes the instant case, and that no rational trier of fact could conclude that Plaintiff's notice was adequate under Third Circuit law.   Because Plaintiff bears the burden of proof at trial of FMLA/NJFLA interference, Defendants meet their initial burden of proof on a Rule 56 motion by pointing to the absence of evidence to support Plaintiff's case.   Celotex, 477 U.S. at 325.   The summary judgment burden then shifts to Plaintiff to "provide[] sufficient evidence to allow a jury to find in its favor at trial."   Gleason, 243 F.3d at 138.   Furthermore, Defendants argue that the relevant evidence of record demonstrates that Plaintiff asked only to work from home during and after the two surgeries, and Defendants consented to his requests to do so.

Plaintiff argues, in opposition to Defendants' motion, that he provided sufficient notice. As to this point, Plaintiff's arguments at opposition repeat the defects found by this Court during consideration of Plaintiff's motion for summary judgment: 1) Plaintiff applies the incorrect legal standard for a "denial of benefits" interference claim; and 2) Plaintiff's evidence, viewed in light of the correct legal standard, is not sufficient to allow a jury to find in his favor at trial.   This Court need not address Plaintiff's arguments at length, because Plaintiff says little that is different on this motion.

As to the legal standard, the subheading in the opposition brief summarizes Plaintiff's position: "Plaintiff Undisputedly Provided Notice Of His Need For Leave Under The FMLA And NJFLA."   (Pl.'s Opp. Br. to Ds.' MSJ at 6.)   This Court has already rejected Plaintiff's contention that this properly reflects Third Circuit law as to the notice element in an FMLA interference claim.

The next question for this Court consider, as before, is whether, under the correct legal

standard, Plaintiff's proffered evidence is sufficient to allow a jury to find in his favor at trial.

Plaintiff does no better on Defendants' motion than he did on his own motion.   The Court will

first address Plaintiff's case with regard to the First Surgery, followed by Plaintiff's case with

regard to the Second Surgery.

      1.  *As to the First Surgery*

What follows is a list of quotations comprising every relevant factual assertion, with cited

evidence, in Plaintiff's opposition brief:

- Plaintiff specifically testified he informed both Defendant Murphy and Ms. Magennis that he would be out for a significant time. *See* SOF ¶¶ 44-45.

- Plaintiff informed Defendant Murphy, "Look, we got to keep this moving. Here's what happened over the weekend. I don't know how long I'm gonna be off, but I'd like to sit down with Liz and get her blessing to move forward with it,…" *See* SOF ¶ 45. *See* SOF ¶¶ 88-91.

- Plaintiff testified:

  > Q. Did you tell Bob [Defendant Murphy] that you needed
  > to take any time off during this period of time?
  > A. <u>I told him that I was gonna be out</u> --
  > Q. Okay.
  > A. -- and until I knew what was happening, I -- I didn't
  > know what was gonna happen, <u>but I was gonna be out and</u>
  > <u>that I -- I had to be out because she needed full-time care.</u>
  > Q. Okay.
  > A. And he knew that.

  *See* SOF ¶ 50 (emphasis added).

- Defendant Murphy admitted at deposition that Plaintiff had informed him of the surgery and further admitted to receipt of text messages and emails from Plaintiff regarding his need to be in the hospital with his wife as well as his need to be at home caring for his wife. *See* SOF ¶¶ 51-63.

(Pl.'s Opp. Br. to Ds.' MSJ at 6.)   Even assuming that these factual assertions are fully

supported by evidence at trial, no reasonable jury could conclude that Plaintiff communicated to his employer an intent to take leave, as to either of the two surgeries.

The cited assertions in Plaintiff's responsive Rule 56.1 Statement are entirely consistent with the factual assertions in the brief and do not add any support to Plaintiff's case as to the fourth element.   Nor does the underlying evidence of record.   The evidence does provide a small amount of additional relevant information.   Plaintiff's deposition testimony reports the following account: Plaintiff's wife had an accident while ice-skating on a Saturday, and Plaintiff and his wife spent Saturday night, March 18, until Sunday, March 19, at the Morristown Memorial Hospital emergency room, where emergency surgery was advised.   (Conway Dep. 110:1-112:3.)   The surgery was scheduled for the following Thursday.   (Id. at 112:7-12.)   On Monday, Plaintiff did some work on things he had planned to do on Thursday.   (Id. at 112:15-19.)   Plaintiff informed Murphy that Plaintiff would "be at work" in the office on Tuesday morning.   (Id. at 113:11-15.)   On Tuesday morning, Plaintiff stated that he talked with Murphy:

> I told Bob that we had to discuss these two items.   We had to.   They were new deals.   They were being processed. . . And I said, Look, we got to keep this moving. . . I don't know how long I'm gonna be off, but I'd like to sit down with Liz and get her blessing to move forward with it, and also talk about Cambridge Pavers.   The owner of that company had a – a past that I had to have blessing from both Liz and Frank to move forward with.

(Id. at 115:720-116:7.)   Shortly after this, Plaintiff met with Murphy and "Liz" (Elizabeth Magennis) in her office.   (Id. at 112:7-12.)   Plaintiff testified:

> We sat down in her office.   I explained to them what happened to Kristie.   I explained to him that I would be out for a significant amount of time, that I'd be working from home. . . . I told them I was gonna be working from home.

(Id. at 113:17-24.)   The deposition transcript states:

> A: I did as much as I could on Tuesday. Yup.   Because they gave me the okay to

> move forward –
> Q. Okay.
> A. – on those two things, which I did.
> Q. Okay. And you had also told them that you'd be working from home?
> A. Yeah.
> Q. Did you tell them how long you'd be working from home?
> A. I told them that my understanding was that this – that she was going to be laid up at least two months.
> Q. Okay. Did they have any problem with you working from home for two months?
> A. They didn't really say anything about it.
> Q. Okay. So they didn't object to it when you told them that you were gonna do it?
> A. No.

(Id. at 116:25-117:18.)   Plaintiff "finished the workday on Tuesday."   (Id. at 114:4.)

Plaintiff "went in early" on Wednesday morning.   (Id. at 114:5.)   That morning,

Plaintiff got a call from his wife to come home:

> I went in to Bob and said, Listen, I got to go home.   I got to take Kristie.   He said, Go right ahead.
> . . .
> I packed up my laptop, the files that I needed, and went home and got her.

(Id. at 114:12-14, 115:5-6.)   Plaintiff went home, took his wife to the hospital, and she had

surgery the next day.   (Id. at 115:6-13.)

Plaintiff stated that he did not remember when he next spoke to Murphy.   At the

deposition, Plaintiff was shown exhibit D-9, described as a chain of emails between Plaintiff and

Murphy, dated March 24, 2017, which Plaintiff said he did not recollect.   (Id. at 118:6-120:13.)

Plaintiff stated that his wife was discharged from the hospital the following Sunday or Monday.

(Id. at 121:23-122:1.)   At the deposition, Plaintiff was asked about the period in which his wife

was hospitalized:

> Q. Did you tell Bob that you needed to take any time off during this period of time?

16

A. I told him that I was gonna be out . . . and until I knew what was happening, I – I didn't know what was gonna happen, but I was gonna be out and that I – I had to be out because she needed full-time care.

(Id. at 120:23-121:5.)

Plaintiff stated that his wife needed full-time care for "at least two months."   (Id. at 123:4-7.)   In regard to this period, he stated:

Q. Okay. Did you ever tell Bob, listen, I can't work, I can't get the job done from home, what are my options?
A. On numerous occasions I would tell him that I'm falling behind. I don't know that I ever said, what are my options? I don't think I did. But I would say, I'm doing my best. You have to understand where I'm at.
. . .
Q. When you told Bob you were falling behind, was this e-mails or text messages or phone calls?
A. All of the above. E-mails definitely. As I said, we spoke on the phone a lot. We would have credit discussions on the phone.   There was a lot of discussion.
. . .
Q. Did you have paid time off available at that time?
A. Yes.
Q. Okay. Is there any reason why you didn't take any paid time off to help during the time your wife needed assistance?
A. It didn't cross my mind that I needed to 'cause I was working.
. . .
Q. Did you think you weren't allowed to take PTO when you wanted to?
A. I – like I said, that didn't cross my mind.   I said to them, this is where I'm gonna be.   I – I will work, but I'm gonna be at home working.
. . .
Q. Did you ask them if you could take PTO?
A. Like I said, it didn't cross my mind to ask that question.

(Id. at 124:5-12, 125:11-16, 127:23-128:8, 128:24-129:3, 129:10-12.)   Plaintiff was shown a copy of an email identified as exhibit D-10, dated April 3, 2017, and stated:

Q. Do you recall sending this email to Mr. Murphy?
A. Yes.
. . .
Q. And it starts off saying, I am still working from home as my wife continues to recover.   And then you go on to describe some work that you're doing; correct?
A. Correct.

17

> Q. What work were you not able to do while you were home caring for your wife?
> A. Well, to be able to do as much as I normally would have done I was not able to do.   I wasn't able to prospect as much.
> . . .
> Q. And during the time that you were home caring for your wife and working from home you were getting paid your regular salary; correct?
> A. Yes.

(Id. at 130:19-21, 131:2-12, 131:19-22.)

Plaintiff also points to the deposition testimony of Murphy and Manning, arguing that: "Defendants' own admissions conclusively prove Plaintiff provided Defendants with sufficient notice to trigger Defendants to inform him of his right to take protected leave to care for his wife."   Plaintiff's single paragraph on this subject contains assertions, with citations to Plaintiff's responsive Rule 56.1 statement, that Murphy and Manning testified that they both understood that Plaintiff's wife had had emergency surgery and "and that Plaintiff needed to help care for her."   (Pl.'s Opp. Br. to Ds.' MSJ at 9.)   The transcript from Murphy's deposition states:

> Q. Okay. And then in [Complaint] paragraph seven it says that Plaintiff Dan Conway informed you regarding his wife's condition and his need to be out of the office to care for his wife.   Do you see that?
> A. Yes.
> Q. Do you recall that occurring?
> A. I recall that he needed to be out of the office.
> Q. Okay. And so did he tell you he needed to be out of the office?
> A. He said he needed to work from home.
> . . .
> Q. Did you ever offer him any time period where he wouldn't have to focus on work so he could just focus on his wife and taking care of her?
> A. No, and neither did he ask for it.

(Murphy Dep. 25:17-26:2, 31:8-11.)

As Defendants argue, as to the First Surgery, no rational trier of fact could conclude that Plaintiff's notice was adequate under Third Circuit law to support the fourth element of a "denial

18

of benefits" FMLA interference claim.   Plaintiff has offered no evidence that he gave notice to

the Defendant of his intention to take leave.   To the contrary, this evidence supports the

inference that Plaintiff conveyed his intention to work from home.   As to the First Surgery,

Plaintiff has failed to point to sufficient evidence to defeat Defendants' motion for summary

judgment.

2.   *As to the Second Surgery*

As to the Second Surgery, Plaintiff's opposition brief contains only one paragraph that

presents Plaintiff's case as to the fourth element.   That paragraph offers only one factual

assertion relevant to the issue of Plaintiff's notice to his employer: "Plaintiff testified he

informed Defendant Murphy that as a result of the neck surgery, his wife needed a second

surgery 'and that there would be significant recovery time.'   *See* SOF ¶¶ 98-99."   (Pl.'s Opp.

Br. to Ds.' MSJ at 10.)   The assertions in Plaintiff's responsive Rule 56.1 Statement are entirely

consistent with the factual assertion in the brief and do not add any support to Plaintiff's case as

to the fourth element.   As Defendants argue, as to the Second Surgery, no rational trier of fact

could conclude that Plaintiff's notice was adequate under Third Circuit law to support the fourth

element of a "denial of benefits" FMLA interference claim.   Plaintiff has offered no evidence

that he gave notice to the Defendant of his intention to take leave.   To the contrary, this

evidence speaks only to Plaintiff's wife's situation and contains no information about Plaintiff,

or his plans for work in response.   As to the Second Surgery, Plaintiff has failed to point to

sufficient evidence to defeat Defendants' motion for summary judgment.   Defendants' motion

for summary judgment as to the "denial of benefits" interference claims will be granted.

## II. The "failure to advise" interference claims

Plaintiff and Defendants have both moved for summary judgment on Plaintiff's

interference claims based on a "failure to advise" theory.   In Conoshenti v. Pub. Serv. Elec. &

Gas Co., 364 F.3d 135, 143 (3d Cir. 2004), the Third Circuit recognized what it termed a "failure

to advise" claim for FMLA interference.   The Conoshenti Court first examined the relevant

regulations and stated:

> [T]he DOL's regulations impose upon the employer obligations to communicate
> with employees regarding their rights under the FMLA. In particular, the
> regulations require employers to provide employees with individualized notice of
> their FMLA rights and obligations. Pursuant to 29 C.F.R. § 825.208(a), "in all
> circumstances, it is the employer's responsibility to designate leave, paid or
> unpaid, as FMLA-qualifying, and to give notice of the designation to the
> employee . . . ."   If an employer provides employees with a handbook concerning
> employee benefits, "the handbook must incorporate information on FMLA rights
> and responsibilities and the employer's policies regarding the FMLA." 29 C.F.R.
> § 825.301(a)(1). If the employer does not provide such a handbook, such
> information must be provided when an employee requests leave. 29 C.F.R. §
> 825.301(a)(2). Moreover, each time the employee requests leave, the employer
> must, within a reasonable time thereafter – "one or two business days if feasible,"
> "provide the employee with written notice detailing the specific expectations and
> obligations of the employee and explaining any consequences of a failure to meet
> these obligations." 29 C.F.R. § 825.301(b)(1), (c).   This specific notice must
> include, among other things, whether "the leave will be counted against the
> employee's annual FMLA leave entitlement," 29 C.F.R. § 825.301(b)(1)(i), and
> "the employee's right to restoration to the same or equivalent job upon return from
> leave," 29 C.F.R. § 825.301(b)(1)(vii).

364 F.3d at 142.   The Court concluded that these regulations imposed upon the employer a

number of duties to advise employees of their FMLA rights.   Id. at 143.   The Third Circuit then

held that a plaintiff "will show an interference with his right to leave under the FMLA, within the

meaning of 29 U.S.C. § 2615(a)(1), if he is able to establish that this failure to advise rendered

him unable to exercise that right in a meaningful way, thereby causing injury."   Id. The Third

Circuit has repeatedly relied on the Conoshenti decision in subsequent failure to advise cases.

20

See, e.g., Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149, 157 (3d Cir. 2015); Lupyan v. Corinthian Colls., Inc., 761 F.3d 314, 318 (3d Cir. 2014).[5]

While both parties have cited Conoshenti, neither party discussed Conoshenti in any detail in any brief.   Nor did either party show awareness that the Parker line of interference cases and the Conoshenti line of interference cases deal with such different issues and standards that they should be considered to address distinct subtypes of interference claims.   As with the interference claims based on a "denial of benefits" theory, the Court will now consider the motions of both sides, applying the correct legal standard to the cases made in the motions for summary judgment.

In Hansler, the Third Circuit stated the Conoshenti standard succinctly: "we found a cause of action for notice interference in the event plaintiff was able to show prejudice as a result of the violation."   798 F.3d at 157.   The Court understands this standard to require proof of three elements: 1) the employer violated a notice obligation; 2) which caused; 3) prejudice to plaintiff.   This Court applies this formulation to Plaintiff's "failure to advise" claims.

"Failure to advise" FMLA interference claims may be further subdivided into two categories: 1) claims based on general employer notice obligations, applicable to all employees; and 2) claims based on employer notice obligations that are triggered by an employee's giving notice of an intent to take leave.   The Court will first address Plaintiff's motion, to which this distinction is relevant, and then Defendants' motion, which does not rely on it.

---

[5] Plaintiff also cites in support Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 92 (2002). In Conoshenti, however, the Third Circuit stated: "*Ragsdale* is not dispositive of anything before us."   Conoshenti, 364 F.3d at 143.

*1. Failure to advise based on general employer notice obligations*

Plaintiff's opening brief contends, in summary:

> As a result of Defendants' failure to provide any FMLA or NJFLA notices,
> Plaintiff was never advised about the FMLA or NJFLA, never saw any postings
> or documentation regarding these laws, and had no idea that he had the option of
> taking protected leave under the FMLA or NJFLA to care for a seriously ill
> family member. *See* SOF ¶ 32.

(Pl.'s MSJ Br. at 3.)   This statement alludes to the subtype of "failure to advise" claim based on

the employer's general obligations to all employees.   Plaintiff's brief contends that Defendants

violated the general obligation to all employees to post informative notices about FMLA and

NJFLA in the workplace, pursuant to 29 C.F.R. § 825.300(a)(1).

As to the posting of information posters, Plaintiff's brief points to the evidence cited in

paragraphs 30 through 32 of Plaintiff's Rule 56.1 Statement.   These statements contend that

both Manning and Murphy offered deposition testimony that they were unaware of any such

posters.   The cited testimony from Manning's deposition states:

> Q. And an employee at ConnectOne, how would they become aware of
> ConnectOne's Family Medical Leave policy?
> A. It's in the Handbook.
> Q. Besides the Handbook, is it anywhere else?
> A, I don't - I don't know.
> Q. So as an HR administrator, you didn't know if it was anywhere else besides the
> Employee Handbook?
> A. No, there probably is, I just – I can't remember exactly where.

(Manning Dep. 30:22-31:8.)   In Manning's cited testimony, Manning was not asked about the

presence of posters in the workplace, nor did she make any statements about the presence or

absence of posters.   The cited testimony from Murphy's deposition states:

> Q. All right. Are you aware of there being any posters setting forth the rights
> under the Family Medical Leave Act or Family Leave Act at ConnectOne's Union
> location?

A. Specifically to those, no.
Q. All right.
A. I know there's posters posted in cafeterias, but I wouldn't be able to tell you what they pertain to.
Q. You don't know what they say?
A. No.

(Murphy Dep. 69:11-21.)   In this testimony, Murphy was asked about the presence of posters, and he stated that there were posters in the cafeterias, but he did not know what those posters said.   At trial, Plaintiff must prove this element by a preponderance of the evidence.   The cited evidence from the depositions of Murphy and Manning is not sufficient to allow a jury at trial to find, by a preponderance of the evidence, that Defendants failed to post the required posters in the workplace.   Even if this Court, however, found that it was sufficient, Defendants have offered evidence sufficient to raise a material factual dispute: Defendants offer the affidavit of Laura Criscione, Chief Compliance Officer of the Bank, which states that the posters are present, that the Bank engaged the Accume company to perform an audit of compliance with posting obligations in 2017, and that Accume issued a report, as of December 31, 2017, which states that the Bank was in compliance with all federal and State of New Jersey labor posting requirements. (Criscione Aff., Criscione Aff. Ex. B.)   This evidence is sufficient to raise a factual dispute about the Bank's compliance with 29 C.F.R. § 825.300(a)(1).

Plaintiff's brief also contends that Plaintiff never saw any "documentation" about FMLA or NJFLA.   (Pl.'s MSJ Br. at 3.)   For evidentiary support, the brief cites paragraph 32 in Plaintiff's Rule 56.1 Statement.   Paragraph 32, however, refers to "posters," but not to any other documentation, and the deposition testimony cited in paragraph 32 says nothing about any documents.   To the contrary, Plaintiff's deposition testimony is adverse to the inference that Defendants never gave Plaintiff documentation of his FMLA rights.   At his deposition, Plaintiff

23

was shown two exhibits, marked D-2 and D-3, and identified as the ConnectOne Employer

Policy Manual.   (Conway Dep. 51:18-52:4.)   This testimony followed:

> Q. Okay. In looking at what's been marked as D-2 and D-3, generally speaking, can you tell me if you've ever seen — are these the handbooks that you had testified that you previously received?   And I understand you haven't reviewed every page, so ...
> A. In the general form, it appears to be similar, yes.
> Q. Okay. And if you look at D-2, if you turn to ConnectOne pages 52 — you got that? And at the top of this it says, Family and Medical Leave.   Do you see that?
> A. I do.
> Q. Okay. And that policy goes on for let's see through ConnectOne page 58; correct?
> A. Yes.
> Q. Okay. And were you aware that ConnectOne -- that this policy was in the handbook?
> A. Yes.
> Q. Okay. And then going on to ConnectOne page 59.   Okay. This at the top says, New Jersey Family Leave. Do you see that?
> A. I do.
> Q. Okay. And were you aware that this policy is in the handbook?
> A. Yes.
> Q. Okay. And then were you familiar with either of those policies?
> A. Having read through them briefly at orientation. Other than that, no.
> Q. Okay. And let's look at D-3.   And you'll see, if you look on the front page of D-3, at the bottom, in the center, it says, November of 2017.
> A. Okay.
> Q. Okay. And you were still employed in November of 2017; correct?
> A. Yes.
> Q. Okay. If you look at what would be ConnectOne — let me try to find it here — I'm sorry — ConnectOne 119. Okay. And at the top it says, Family and Medical Leave Policy. Do you see that?
> A. I do.
> Q. And that section of the policy continues through ConnectOne 125?
> A. Yes.
> Q. Okay. And were you aware that this policy was in the updated handbook?
> A. Similar to the original, yes.
> Q. Okay. And then also looking at page 126, one which starts New Jersey Family Leave Policy. It goes on from 126 through 130.   Were you aware that this policy was in the updated handbook?
> A. Yes.
> (Receipt & Acknowledgment of Employee Policy, Bates Nos. ConnectOne 00037,5, is received and marked D-4 for Identification.)

24

Q. Okay. Mr. Conway, I show you what's been marked D-4 for Identification. Closing the loop on the handbook, is that your signature at the bottom of this page?

A. Yes.

Q. Okay. And it appears to be dated March 14, 2016; is that correct?

A. Yes.

Q. And you had said that there was some kind of -- or you mentioned an orientation previously when we were looking at the handbook?

A. Yes.

Q. Did, at this orientation, somebody go through the handbook with you?

A. Not in detail.

Q. Okay. Do you recall who that was who went through it at all?

A. The -- there was a policy handed to us –

Q: Okay.

A. – and it was said to read and review --

Q. Okay.

A. – and that we would have to acknowledge it.   I do not remember who the orientation person was. It was only, I believe, one day.

Q. Okay.

A. But they did not go through it in detail.

Q. Okay. And this was the document that they asked you to --

A. Yes.

Q. – acknowledge?

A. Yes.

(Conway Dep. 52:6-56:12.)   In this testimony, Plaintiff states that he attended an orientation session in which he was shown handbooks which contained sections about the FMLA and the NJFLA, that he read through these sections briefly at the orientation, that he was aware that these handbooks contained information about Defendants' policies as to the FMLA and the NJFLA, and that a document acknowledging his receipt of the policy handbooks was dated March 14, 2016 and bore his signature.   Thus, not only has Plaintiff failed to cite any evidence to support the argument about FMLA documentation, but, even if he had done so, Defendants have offered evidence sufficient a raise a factual dispute about this issue.[6]

---

[6]  Indeed, even though Defendants failed to move for summary judgment on this basis, since Plaintiff has not made any contention that the disclosures in the handbook are insufficient to

2. *Failure to advise based on responsive employer notice obligations*

Plaintiff also contends that Defendants failed to provide "individualized" FMLA/NJFLA

notice, by which Plaintiff refers to a number of the employer's responsive notice obligations

triggered by an employee's notice of intended leave: 1) Defendants failed to provide Plaintiff

with the "eligibility notice" required by 29 C.F.R. § 825.300(b)(1); 2) Defendants failed to

provide Plaintiff with the "rights and responsibilities notice" required by 29 C.F.R. §

825.300(c)(1); and 3) Defendants failed to provide Plaintiff with the "designation notice"

required by 29 C.F.R. § 825.300(d)(1) and (4).   The brief also states:

> [Defendants] never gave Plaintiff an Eligibility Notice, Rights and
> Responsibilities Notice, or Designation Notice; and never told Plaintiff the
> amount of leave he could take that would be counted against his FMLA or NJFLA
> entitlement. *See* SOF ¶¶ 42, 45, 49, 51, 52-54, 57-60.

(Pl.'s MSJ Br. at 17.)

The employer's individualized, responsive notice obligations are set forth in subsections

of 29 C.F.R. § 825.300.   The "eligibility notice" subsection begins:

> When an employee requests FMLA leave, or when the employer acquires
> knowledge that an employee's leave may be for an FMLA-qualifying reason, the
> employer must notify the employee of the employee's eligibility to take FMLA
> leave within five business days, absent extenuating circumstances.

29 C.F.R. § 825.300(b)(1).   This provision establishes two possible triggers for imposing the

employer's obligation to provide the "eligibility notice:" 1) the employee requests FMLA leave;

or 2) the employer acquires knowledge that an employee's leave may be for an FMLA-

qualifying reason.   To prove a violation of 29 C.F.R. § 825.300(b)(1), then, Plaintiff must prove

---

meet the general notice requirements of the FMLA and NJFLA, and Plaintiff concedes that he
read and had access to them, it appears that Plaintiff's claim on this ground must fail as a matter
of law, even apart from the arguments presented by Defendants and discussed *supra*.

that he established one of the predicate conditions, the triggers.   Plaintiff has not shown that he

can establish either predicate condition.   As already established, Plaintiff has no evidence that

he requested FMLA leave; he does not even argue that he did so.   The language of the second

predicate condition does not mention an employee request; it refers to there being an

"employee's leave."   To meet this condition, then, an employee's leave must have at least

started.   Plaintiff does not even contend that he meets this predicate condition.   Rather, as

already discussed, Plaintiff contends that he was denied leave, not that he took it.   Plaintiff has

not offered evidence that he satisfied either predicate condition stated in 29 C.F.R. §

825.300(b)(1).

Moreover, in this subsection of Plaintiff's opening brief, in arguing that Plaintiff

triggered these responsive obligations, Plaintiff uses this phrasing: 1) "despite knowing of

Plaintiff's need to care for his seriously ill wife;" and 2) "Defendants ignored Plaintiff's

notifications regarding his need to care for his wife."   (Pl.'s MSJ Br. at 17.)   These phrases

assert only that Plaintiff conveyed, and his employers understood, that he needed to care for his

wife.   They say nothing about Plaintiff's taking leave to do so.[7]   The Court need not determine

whether the evidence supports these assertions because, even if true, they do not establish either

of the predicate conditions required by 29 C.F.R. § 825.300(b)(1).

As to the "rights and responsibilities" responsive notice obligation, 29 C.F.R. §

---

[7] Plaintiff never actually goes so far as to expressly argue that, having conveyed his need to care
for his wife, Defendants had an obligation to counsel him about the possibility of taking leave,
but this is an implication that runs through Plaintiff's briefs.   Plaintiff at no point establishes a
legal basis for this idea, which certainly heads in the direction of requiring the employer to be
"clairvoyant," an idea which the Third Circuit expressly rejected in Lichtenstein, 691 F.3d at
303.

825.300(c)(1) expressly incorporates the predicate conditions stated in 29 C.F.R. §

825.300(b)(1): "This notice shall be provided to the employee each time the eligibility notice is

provided pursuant to paragraph (b) of this section."   Because Plaintiff has failed to establish the

predicate condition stated in 29 C.F.R. § 825.300(b)(1), he has failed to establish the predicate

condition for 29 C.F.R. § 825.300(c)(1).

As to the "designation notice" responsive notice obligation, 29 C.F.R. § 825.300(d)(1)

states:

> When the employer has enough information to determine whether the leave is
> being taken for a FMLA-qualifying reason (e.g., after receiving a certification),
> the employer must notify the employee whether the leave will be designated and
> will be counted as FMLA leave within five business days absent extenuating
> circumstances.

Plaintiff's opening brief does not address this language but, for the reasons already discussed,

this Court determines that Plaintiff has no evidence that could demonstrate to a jury that

Defendants at any point had enough information to determine that Plaintiff would or did take any

leave.   Plaintiff has failed to establish the predicate condition for 29 C.F.R. § 825.300(d)(1).

Plaintiff also offers the following evidence relevant to his "failure to advise" claim.   In

paragraph 32 in Plaintiff's Rule 56.1 Statement, Plaintiff cites to the following two portions of

his deposition testimony:

> Q. Let's see. Paragraph 12 states, Instead of being able to take time off to care for
> his wife, Plaintiff was forced to continue working and was denied the benefits of
> the Family Medical Leave Act.   Do you see that?
> A. 1 do.
> Q. Okay. Tell me how you were forced to continue working.
> A. Well, as I said, I wasn't offered rights to take off to care for her. When I said
> that these issues were coming about, I told my boss, his boss, and nobody said
> you have a right under this to go care for your wife. Nobody said that.   What I
> said was, I will work from home to keep up with what my job requires.   It was
> like, okay. The answer was, fine.   Not, you have these rights.

28

Q. Okay. And you could have gone in and checked off for PTO for these days;
correct?

A. So the surgery, as I mentioned, the first one I had time off already scheduled.

Q. Right. For something else, originally.

A. Originally.

Q. Okay.

A. Originally. The second one, I had the week off for Christmas and vacation for
– for that week. I could have. It wasn't offered. It wasn't suggested. It wasn't
offered. The expectation that I had from my boss was you are going to continue to
work. You look at e-mails that he sent me, the expectation, Budd Van Lines,
what's the plan? Not work at home or don't work at home, take time off, we'll
take care of this. There was none of that.

Q. Well, you told them you were gonna work from home; correct?

A. That was the plan, to take care of – and to be a good employee.

Q. Okay.

A. But at the same time, if I had the option to care for my wife -- which clearly
she needed -- and twice -- and someone had said to me, took, you have disability,
you will not lose your job, you will not be looked at negatively, you have the right
to go care for your wife for X amount of weeks or days, whatever it is -- I don't
know, I'm not sure what it is -- I would have taken it. Because she almost died.
My wife almost died. And when I tell people this and I say, you know, I'll do my
best, I'll keep working, and showing them time after time that I'm doing my best
or I'm falling behind, nobody says take time off. Do that. Keep working. No, it's
where are we with this? What's going on with that? That's requiring you to work.

Q. Well, you didn't have to take FMLA even if you had the option, is that correct,
to your understanding?

A. It's my understanding now.

Q. Okay.

A. I didn't understand it then.   I didn't know about it then.

. . .

Q. Paragraph 15 says, Again, Plaintiff informed Defendants of his wife's
condition and he was prevented from taking care — prevented from taking leave
to care for his wife.   So once again, in that instance, how were you prevented
from taking leave to care for your wife?

A.  I was prevented because I wasn't made aware of my rights.

(Conway Dep. 149:2-151:20, 152:10-18.)   This testimony does not have the breadth that

Plaintiff contends: it says no more than that he was not informed of his FMLA rights on the

occasions when he informed Defendants about his wife's surgeries.   Plaintiff's brief, as well as

paragraph 32 in Plaintiff's Rule 56.1 Statement, make the much more far-reaching assertion that

Defendants <u>never</u> informed Plaintiff about his FMLA rights, and this testimony does not support

an inference that Defendants never so informed Plaintiff.   Plaintiff's deposition testimony

supports only the much more limited inference that Defendants did not inform Plaintiff about his

FMLA rights during the times that Plaintiff discussed his wife's surgeries and recovery with

them.   Plaintiff has not persuaded this Court that this evidence supports his FMLA interference

claim.

Thus, as to the first element of a "failure to advise" FMLA interference claim based on

the employer's responsive notice obligations, which is the violation of an employer notice

obligation, Plaintiff has failed to persuade this Court that he is entitled to a grant of summary

judgment.   As to the responsive obligations to provide notice, Plaintiff has not offered sufficient

evidence to allow a jury to find that these obligations were ever triggered.   Based on the

violation element alone, Plaintiff's motion for summary judgment on the "failure to advise"

claims based on the employer's responsive notice obligations must be denied.

Plaintiff's opening brief addresses the element of prejudice in these claims but deals with

it in a purely conclusory manner.   While Plaintiff addresses the alleged violations by the Bank in

very specific terms, Plaintiff addresses causation and prejudice only vaguely and does not even

articulate a theory of how a specific failure to advise him (that is, a specific alleged violation of

an employer notice obligation) resulted in a specific injury, much less attempt to muster any

evidence to demonstrate that this happened.   Plaintiff does argue that the prejudice is

demonstrated in his eventual termination, but Plaintiff fails to provide any argument or evidence

that the employer's violation of a notice obligation caused his termination.   The closest Plaintiff

gets are these statements: "Plaintiff was then fired on May 1, 2018, effective May 11, 2018. . .

30

Accordingly, Plaintiff was plainly prejudiced by his inability to take protected leave." (Pl.'s MSJ Br. at 20.) If this is Plaintiff's theory of his failure to advise claim, much is missing. Crucially, the "inability to take protected leave" alleged is neither explained nor grounded in evidence. In what way was Plaintiff unable to take FMLA leave, and how did that result in his termination? At this point, this is a vague assertion without a sufficient basis in the evidence. Plaintiff also cites case law in support of the proposition that an interference claim may be based on the employer's actual discouragement of using FMLA leave, in violation of 29 C.F.R. § 825.220(b), but fails to even attempt to demonstrate that such a violation occurred in this case.

This Court concludes that Plaintiff has failed to make the required showing as to at least one essential element of his FMLA/NJFLA interference claims, whether based on a "denial of benefits" theory or a "failure to advise" theory. Plaintiff therefore cannot demonstrate that he is entitled to judgment as a matter of law on Count One or Count Three, as required by Federal Rule of Civil Procedure 56(a). Plaintiff's motion for summary judgment must be denied.

> 3. *Defendants' motion on the interference claims based on a "failure to advise" theory*

Defendants move for summary judgment on Plaintiff's "failure to advise" interference claims on the ground that Plaintiff cannot show that he suffered prejudice. Defendants' argument invokes two of the three elements of the "failure to advise" standard stated by the Third Circuit in <u>Hansler</u>: a plaintiff must "show **prejudice** *as a result of* the violation." 798 F.3d at 157 (emphases added). Defendants thus have not moved for summary judgment as to the issue of the element of the violation of the employer's notice obligation. Because Plaintiff bears the burden of proof of FMLA interference at trial, Defendants satisfy their initial summary judgment burden by pointing to the absence of evidence to support Plaintiff's case.

Plaintiff's opposition brief jumbles together his "failure to advise" FMLA interference claim with his "denial of benefits" FMLA interference claim.   This Court, however, has disentangled the two by reading Plaintiff's brief in light of the correct Third Circuit standards, applying the distinction between the two subtypes of claims.   Plaintiff's opposition brief addresses all the elements of the "failure to advise" standard.   Because Defendants, however, did not raise the violation element, the Court does not reach Plaintiff's arguments on that element.

Plaintiff argues that "Defendants failed to give Plaintiff notice of his FMLA/NJFLA rights and Plaintiff was prejudiced by this failure."   (Pl.'s Opp. Br. to Ds.' MSJ at 5.) Plaintiff's formulation of this contention accurately tracks the requirements for a "failure to advise" claim under <u>Conoshenti</u>, but the element of causation must not be overlooked.   As to a demonstration of causation and prejudice, Plaintiff's opposition brief first argues that Defendants' failure to post informative posters in the workplace caused Plaintiff to be unable to take leave, which caused him to have performance issues, which caused his termination.   No evidence is cited to support any aspect of this.

Pages later, Plaintiff's opposition brief argues a second approach to the element of prejudice: "Plaintiff establishes prejudice because he was denied the opportunity to take FMLA/NJFLA leave to care for his wife, criticized, reprimanded, and ultimately terminated." (Pl.'s Opp. Br. to Ds.' MSJ at 14.)   This Court need not look further into this argument because it simply fails to reflect the correct Third Circuit standard: Plaintiff does not even argue here that a failure to advise caused him to be unable to exercise an FMLA right in a meaningful way, which caused his termination.   After discussing the evidence, Plaintiff's opposition brief states,

in summary:

> Plaintiff informed Defendants of two serious health conditions his wife suffered and his need to be out of the office to care for her. Faced with that knowledge, Defendants utterly failed to meet their obligations and inform Plaintiff of his right to protected leave under the FMLA and/or NJFLA. Plaintiff was indisputably prejudiced by this failure both in his inability to take a protected leave to care for his wife and his subsequent termination. Defendants attempt to claim that because Plaintiff was paid while he worked from home and cared for his wife means he was not prejudiced by his inability to take a protected leave only further highlights Defendants' attitude towards both the FMLA and NJFLA and their obligations under these laws. Plaintiff's pay wasn't the issue – it was Plaintiff's ability to both care for his wife and protect his job. As a result of Defendants' failure to meet their obligations under the FMLA and NJFLA, Defendant was denied the ability to do either, plainly demonstrating prejudice.

(Pl.'s Opp. Br. to Ds.' MSJ at 18.)   This is Plaintiff's summary of his "failure to advise" case, and it does not sufficiently argue every element of the relevant legal standard.   Plaintiff's argument has two big holes that are papered over with conclusory language: it does not explain how the alleged failures to advise caused Plaintiff to be unable to exercise an FMLA right in a meaningful way,[8] nor does it explain how Plaintiff's inability to exercise his FMLA right in a meaningful way caused his termination.   Another way of saying this is: Plaintiff appears to argue that the alleged failures to advise caused his termination by rendering him unable to exercise his FMLA rights.   Plaintiff has in no way even given an account of how the evidence demonstrates this, much less actually pointed to evidence that does demonstrate this.   Because of these big holes in Plaintiff's case that the alleged failures to advise caused him prejudice, Plaintiff has failed to point to evidence sufficient to prove his "failure to advise" FMLA interference claim, and thus has failed to defeat Defendants' motion for summary judgment on

---

[8] Furthermore, Plaintiff has pointed to no evidence that could persuade a jury that he was *unable* to exercise his FMLA rights.

the FMLA interference claim.

As to the "failure to advise" interference claims, Defendants have show that they are entitled to judgment as a matter of law, and their motion for summary judgment will be granted.

## III. The retaliation claims

Defendants move for summary judgment as to Count Two and Count Four in the Complaint, the FMLA and NJFLA retaliation claims.   Defendants argue that these claims fail as a matter of law, on several grounds.   First, Defendants argue that Plaintiff cannot prove the essential predicate act – the taking of protected leave or an invocation of the right to take protected leave.   See Conoshenti, 364 F.3d at 146 ("to be successful on this claim, [plaintiff] must show that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave.")   In opposition, Plaintiff acknowledges the Conoshenti standard for a retaliation claim, but argues that this must be understood in the context of the Third Circuit's subsequent interpretation of Conoshenti in Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009):

> [W]e interpret the requirement that an employee "take" FMLA leave to connote invocation of FMLA rights, not actual commencement of leave.   We therefore hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.

Plaintiff is correct that, pursuant to Erdman, the first element is satisfied if Plaintiff can demonstrate that he invoked his FMLA rights to take leave.   This point, however, does not help Plaintiff to defeat Defendants' motion.   This Court has determined that Plaintiff has offered no evidence that would persuade a reasonable jury to conclude that he invoked his right to leave; to the contrary, this Court has concluded that Plaintiff's evidence supports the adverse finding that

34

Plaintiff requested to work from home and did not invoke his right to leave under the Third Circuit's standard.   Because this Court has determined that Plaintiff has no evidence that he even sought protected leave at the time of the First Surgery or the Second Surgery, he cannot prove the first element of his retaliation case under Third Circuit law.   Defendants are indeed correct that the retaliation claims must fail as a matter of law.

Defendants next argue that, even if Plaintiff were able to offer evidence in support of the first element, he cannot prove the third element of a *prima facie* retaliation case under Conoshenti, the existence of a causal link between his termination and his invocation of protected leave rights.   Defendants argue that, to the extent that Plaintiff will argue for a causal inference based on temporal proximity alone, the law requires far greater closeness in time than Plaintiff can show.

In opposition, Plaintiff relies on temporal proximity "along with the other circumstantial evidence that justifies an inference of retaliatory motive" to establish a causal connection.   (Pl.'s Opp. Br. to Ds.' MSJ at 21.)   In support for this two-pronged approach, Plaintiff points to the Third Circuit's decisions in EEOC v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997) and Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).   Plaintiff's parenthetical summary of EEOC, however, is literally correct but is misleading in this context: the EEOC Court held that the evidence showed that the protected activity and the adverse employment action were "sufficiently close together to allow a reasonable fact finder to find the required element of causation;" that Court did not rely on a combination of temporal proximity with other circumstantial evidence to infer causation.   EEOC, 123 F.3d at 754.   Farrell, however, is more apposite since, in that case, the Third Circuit rejected any limiting formulation of the types of

35

evidence required to show causation sufficient to establish the *prima facie* case: "our caselaw has set forth no limits on what we have been willing to consider." <u>Farrell</u>, 206 F.3d at 281.   The <u>Farrell</u> Court stated that, while many Third Circuit decisions have based a causal inference on a combination of temporal proximity and a pattern of antagonism, this does not limit the kinds of circumstantial evidence that a court may find sufficient.   <u>Id.</u> at 280-281 ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference.")

As for the temporal proximity element, Plaintiff points to an email Magennis sent the day after Plaintiff informed Defendants of the First Surgery.   That email, from Magennis to Murphy, dated March 22, 2017, states, in its entirety:

> Bob,
>
> I'm sorry to keep bothering you about this, but I need on update on Dan's 60 day written warning that we discussed in February.   I spoke to Kate Perlman, but she indicated you have not send [sic] her anything.   Please let me know if we should discuss further.   Thank you.

(McKinney Aff. Ex. P.)   Plaintiff argues that the timing of this email, sent the day after he told Defendants about the First Surgery and his plan to work from home, supports a causal inference that his invocation of FMLA rights caused his termination, a decision which Plaintiff contends Defendants made on April 26, 2018 – over one year later.[9]   The Court disagrees, and finds that

---

[9] Plaintiff does not make a temporal proximity argument about the First Surgery events and the termination itself, separated in time by over a year, which would not be likely to succeed under Third Circuit precedent.   <u>See</u>, <u>e.g.</u>, <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003) (holding that a three week gap between the protected activity and termination was not sufficiently close to infer causal connection.)

no reasonable jury could find, on the basis of the email by itself, in the context of the undisputed facts of the time of the First Surgery and Plaintiff's termination, that this email constitutes sufficient evidence of a causal connection.   To the contrary, this email supports inferences that are adverse to Plaintiff's case: it appears to document that Defendants discussed serious concerns about Plaintiff's work performance in the month prior to the emergency First Surgery.   Such an inference is adverse to Plaintiff's case on causation.

Plaintiff appears to recognize, however, that the email could be problematic for his case, and appears to attempt to counter the adversity of this email.   Although Plaintiff does not actually put together an argument in the opposition brief, he points to evidence which, he argues, shows that both Murphy and Magennis testified that he/she did not remember the discussion the email refers to.   Plaintiff also points to the fact that he received a review with a performance rating of "Meets Expectations" in February of 2017.   Plaintiff does not formulate an argument about what adding these pieces of evidence to the email does to his causation case.   The Court does not see how this evidence, viewed together, is sufficient to persuade a reasonable jury that Plaintiff's invocation of FMLA rights caused his termination.   As already stated, the email is adverse to Plaintiff's case on causation, and the additional evidence does not turn a negative into a positive.[10]   At best, it might undermine a jury's confidence in relying on the email as probative.   That does not make it sufficient to demonstrate causation.

Plaintiff then makes several assertions about the evidence, which will be reviewed briefly

---

[10]   Moreover, Defendants have offered evidence that the record of emails shows that Magennis asked Murphy for information on Plaintiff's performance in November of 2016, again in December of 2016, and then again on March 9, 2017.   (Luckner Cert. Exs. F, G, M.)   All of these emails bear dates from before the First Surgery.

here and explored more fully subsequently: 1) Plaintiff received a performance review in February of 2017 which rated him as "Meets Expectations," and also received a merit pay increase; 2) Magennis criticized Plaintiff's performance during the time that he worked from home because of the First Surgery, but not during the period between when he returned to the office and his termination; and 3) Plaintiff received a performance review in January of 2018 which rated him as "Meets Expectations."   The evidence regarding what Magennis said and when will be discussed in detail later, and it is sufficient to state at this point that Plaintiff's second assertion here about the evidence is not at all supported by the evidence of record. Plaintiff's statements about the ratings given in the two performance reviews are supported by the record.

Plaintiff next makes these assertions about the evidence: 1) "Defendants have changed the reason for Plaintiff's firing" (Pl.'s Opp. Br. to Ds.' MSJ at 23); and 2) Defendants have failed to identify who made the decision to terminate Plaintiff.   Both of these assertions will be explored in detail in the discussion of pretext that follows, and, in short, there are grains of truth to them, but not more than that.   In conclusion to the subsection on causation, Plaintiff argues: "As such, the stark inconsistencies and shifting rationales in Defendants' termination reason, including who made the ultimate decision to terminate, render its decision to fire Plaintiff highly suspect."   (Pl.'s Opp. Br. to Ds.' MSJ at 24.)   This is an argument about pretext, not causation; the issue at the moment is, has Plaintiff pointed to sufficient circumstantial evidence of causation to make out a *prima facie* case?

This question does not have an easy answer, in view of the "modest" evidentiary burden required to make out a *prima facie* case:

38

> The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent -i.e., that discrimination could be a reason for the employer's action. As we have held on numerous occasions, this initial burden "is not intended to be onerous."

Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996).   Although it is clear that the time periods in which Plaintiff worked only outside of the office are not sufficiently proximate in time to his date of termination to be sufficient, alone, to support the causation element of the *prima facie* case, this Court need not decide the question of whether Plaintiff's additional circumstantial evidence, combined with the temporal proximity evidence, is sufficient under Third Circuit law, because this decision will not affect the outcome.   Because this Court has determined that Plaintiff has not made out the first element of his *prima facie* case, that he invoked his FMLA rights to leave, Plaintiff has failed to make out a *prima facie* case of retaliation.   Moreover, because, as explained in the discussion that follows, this Court concludes that Plaintiff has failed to sufficiently rebut the employer's asserted legitimate reason for termination, as required to defeat the motion for summary judgment, Plaintiff cannot prevail on his retaliation claims even if this Court were to find that Plaintiff did make out a *prima facie* case.   This decision cannot change the outcome.

Last, Defendants move for summary judgment on the retaliation claim on the ground that they can articulate a legitimate, non-discriminatory business reason for terminating Plaintiff's employment: poor performance.   Defendants point to this evidence:

- Emails in which Magennis asked Murphy for documentation about Plaintiff's production to date in November of 2016, with a follow-up request for the documentation in December of 2016.   (Luckner Cert. Exs. F, G.)

- A performance review document which states that Plaintiff began work for Defendants on March 7, 2016; Murphy completed the review of Plaintiff's

performance for all of 2016 in January of 2017.   The review categorized Plaintiff as "Meets Expectations" in all rating categories.   In the "Summary of Job Performance," the document states: "He is a seasoned banker and has been charged primarily with new business development for CNOB."   In "2016 Financial Highlights," it states "Loan Origination" of $7.4MM, "Deposit Growth" of $250K, and "Fee Income" of $90K, of which $75K was anticipated fees; "As revenue generation takes time when transitioning to a new bank, Dan was not given any formal performance goals for 2016.   He is charged with developing a new business strategy that will lead to significant results in 2017.   Dan has spent a significant amount of time in 2016 marketing CNOB to his COI network and former client base.   Dan successfully developed 4 new clients and has good momentum going into 2017.   He will be counted on heavily in 2017 to help the C&I team reach its overall goals."   Under "Strengths," it states: "Good marketer of CNOB to COI network.   Strong credit skills.   Strong work ethic."   Under "Areas for Improvement," it states: "Results, results, results!!!   Increased exposure to senior management.   Improvement as a team player."   Under "Goals for Next Year," it states: "Loan Origination: $50MM.   Deposit Growth: $15MM. Fee Income: $150K."   The "Overall Performance Rating" states "Meets Expectations."   (Luckner Cert. Ex. H.)

- An email chain indicates that, on March 9, 2017, Magennis asked Murphy to tell her what loans and deposits Plaintiff had "sourced on this own, and what has booked since he started . . ."   Murphy responded with an email that summarized Plaintiff's "production" since his start date as follows: "Plaintiff closed $16.6MM in commitments $7.3MM in outstandings to six new clients to CNOB.   He sourced three of those." "documents are currently being prepared for two new clients (sourced by Dan) for 2 new new transactions totaling $2.7MM."   Total deposits of approximately $10MM.   Total loan fees generated $182K.   The bank had been awarded merchant services business expected to result in an estimated annual fee revenue of $75K.   In the pipeline are approximately $100MM in loans and $30MM in deposits with 18 prospective clients.   (Luckner Cert. Ex. M.)

- An email from Magennis to Murphy, dated April 11, 2017, states: "I know I've asked you on numerous occasions about Dan's progress and his written warning and/or dismissal.   I am requesting that you meet with me in Monday, April 17[th] at 3pm.   I want a clear and concise report as to what he has accomplished (on his own) since his hire last year, and when I can expect his replacement."   (Luckner Cert. Ex. O.)

- An email chain shows that, on May 17, 2017, Magennis continued the chain begun by her on April 11, 2017, to Murphy about a meeting to be held on April 17; on May 17, 2017, she wrote: "Where are we with this?   I'd like some clarification on what your next steps are here."   Murphy responded that same

day: "Working with Kate on a performance plan where specific milestones will have to be met. . . his pipeline is acceptable."   (Luckner Cert. Ex. Q.)

- An email chain shows that, on May 18, 2017, Magennis wrote to Murphy and stated: "Again I am going to stress that Dan Conway's production does not justify his $222,000 annual package.  . . . Your team's payroll is considerably higher than the CRE team and the outstandings are considerably lower.   I would would [sic] be very disappointed if we had to drill down the numbers and let some people go in the future.   Please consider the cost vs the benefit of having Dan on your team."   Murphy responded on the same day, "I understand your position on Dan and the overall overhead related to the C&I effort and look forward to is [sic] discussing the strategy of the group going forward."   (Luckner Cert. Ex. R.)

- A message chain between Magennis and Perlman, dated May 31, 2017, shows, in summary, that Magennis asked Perlman if Murphy had spoken with her about Plaintiff and whether there was a "formal plan in place."   Perlman said that they had spoken, and that Murphy was setting performance targets for Plaintiff. Magennis stated: "Can you please help me?   Bob is completely dragging his feet and I am not happy.   I really wanted to give him a final warning."   Perlman answered, "Yes."   (Luckner Cert. Ex. R.)

- An email chain dated June 12, 2017 shows Magennis continuing the chain with Murphy from March 9, 2017, in which Murphy reported Plaintiff's production since hire, and states: "I know I have had NUMEROUS conversations and emails back and forth on the topic of [Plaintiff's] overall performance here at CNOB since March 2016.   I have asked you on multiple occasions what his progress is and whether or not you've given him a verbal and/or written warning or performance plan.   It is now the middle of June 2017 and I have not seen any progress.   Please come with me tomorrow morning at 9am to discuss this in detail.   I want a detailed report of every loan and deposit that Dan has sourced – HIMSELF since he has joined your team.   On another note, I have discussed with you that Dan's attitude does not lend itself to the team spirit that we strive to have here at ConnectOne Bank. . . . I have heard only negative talk about his attitude as well as his behavior in public forums that do not align with the core values that we take great pride in.   I feel that you are ignoring the concerns I have around this situation."   Murphy responded on that day to say that he would be in her office at 9am, and that he was working with Perlman on a performance plan. (Luckner Cert. Ex. V.)

- A document titled, "New Business Development plan June 15th 2017" states that it was by Plaintiff for Murphy.   The document summarizes what appears to be the status of current work projects and anticipated future contacts.   (Luckner Cert. Ex. T.)   A message indicating authorship by Plaintiff has a handwritten

notation on the top, "email sent to Bob Murphy 6/13/17," and states: "See attached.   I am confident I will deliver on the attached, and I am focused on exceeding $50MM in new business this year.   I realize I have been off to a slow start."   (Luckner Cert. Ex. U.)

- A document with the heading, "Performance Evaluation," gives an evaluation of Plaintiff by Murphy, dated January 26, 2018.   The review categorized Plaintiff as "Meets Expectations" in all rating categories.   Under "Detailed Feedback," the document states: "Although Dan actively pursues opportunities in the markets, results in 2017 fell below expectations.   Dan closed 9 transactions to 6 clients (1 new relationship) totaling approximately $19.5MM with approx. $6MM funded. . . Deposits are were [sic] approx $4MM at year end . . . Dan's pipeline going into 2018 is acceptable and he needs to win these deals.   With approximately 2 years at CNOB, he will be counted on heavily in 2018 to generate significant revenue." "Areas for improvement" included "Need to be more of a team player."   Under "Goals for Next Year," it states: "loan origination $40MM Deposit growth: $25MM Fee Income: $150K."   (Luckner Cert. Ex. Y.)

- Murphy testified that Magennis "wanted Dan terminated."   (Murphy Dep. 145:11.)   Murphy stated that he did not remember exactly what Magennis said to him, but her conclusion was that "over a long period of time . . . she felt that the performance wasn't there."   (Id. at 146:1-4.)   Murphy stated that, as to the period of 2018 after the review until termination, "I didn't feel that the business plan was coming to fruition, no."   (Id. at 146:9-12.)   Murphy explained that, during that period, in general, Plaintiff was not making sales or bringing in new business.   (Id. at 146:13-17.)   Magennis stated: "We were past the two-year mark, Dan never hit the 40, 50 million dollar number after two years and I think Bob understood that Dan had to be terminated."   (Magennis Dep. 148:5-10.)

Defendants offer the evidence above to support their contention that the legitimate reason for Plaintiff's termination was poor performance.

Furthermore, Defendants contend that Plaintiff has no evidence to support finding that this legitimate reason for termination is a pretext for unlawful discrimination.   Defendants having offered a legitimate reason for the termination, the summary judgment burden then shifts to Plaintiff:

This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-

42

discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.   In other words, because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.

. . .

[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).   See also Lupyan, 761

F.3d at 324 (applying Fuentes to review of summary judgment in an FMLA retaliation case.)

Plaintiff, in opposition, summarizes his summary judgment pretext case as follows:

Defendants' proffered reasons for firing Plaintiff – alleged poor production and failure to live up to Defendants' core values - are suspicious, implausible, and contradicted by the record. As such, there is a strong indication that Defendants are not telling the whole story and are hiding illegal discrimination.

(Pl.'s Opp. Br. to Ds.' MSJ at 24.)   In support of this approach, Plaintiff cites DeWees v. RCN

Corp., 380 N.J. Super. 511, 528 (N.J. Super. Ct. App. Div. 2005), and the DeWees Court quoted, and

applied, the following standard from Fuentes:

the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find

them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

DeWees, 380 N.J. Super at 528 (quoting Fuentes, 32 F.3d at 765 (citations omitted)).

Plaintiff's opposition brief then presents a chart summarizing Plaintiff's evidence for pretext.   In sum, Plaintiff points to evidence tending to establish the following factual assertions,[11] making every reasonable inference in Plaintiff's favor: 1) Murphy told Plaintiff that he was being terminated because of a reorganization; 2) when questioned at her deposition, Magennis remembered few details about the specific circumstances around Plaintiff's termination; 3) Murphy had many positive things to say about Plaintiff as an employee; 4) Murphy did not recall speaking with Magennis about Plaintiff's performance prior to March 9, 2017; and 5) Plaintiff was the only employee who reported to Murphy that Magennis recommended to be terminated.

Having cited this evidence, Plaintiff contends: "These shifting, contradicting rationales create a question of fact as to whether Defendant is attempting to cover up illegal discrimination."   (Pl.'s Opp. Br. to Ds.' MSJ at 26.)   Making every reasonable inference in favor of the Plaintiff, this Court does not find that Plaintiff has offered evidence that could persuade a reasonable jury to make a finding that Defendants' reasons for the termination are unworthy of credence.

The Court makes this determination for several reasons.   First and foremost, Plaintiff has not disputed Defendants' contention that he performed poorly during the entire time of his

---

[11] Plaintiff also made a number of factual assertions, *e.g.*, "Plaintiff was also the only employee Ms. Magennis ever recommended be terminated," that are not supported by the record and will not be further discussed.   (Pl.'s Opp. Br. to Ds.' MSJ at 25.)

employment.   Plaintiff has not even contested any material factual assertion made by Defendants about his poor performance, much less presented evidence which could support a jury finding that Plaintiff did not manifest poor performance before, during, or after the First Surgery and the Second Surgery.   Plaintiff has challenged neither the authenticity of the documentary evidence offered by Defendants nor its substance.   The single piece of evidence offered by Defendants that is most adverse to Plaintiff's pretext case is his written admission of a "slow start:" Defendants offered a document which has a handwritten notation on the top, "email sent to Bob Murphy 6/13/17," and which states, "See attached.   I am confident I will deliver on the attached, and I am focused on exceeding $50MM in new business this year.   I realize I have been off to a slow start."   (Luckner Cert. Ex. U.)   Because Plaintiff has not challenged this evidence in any way, a reasonable jury would understand it to be a written admission that Plaintiff's performance was deficient during the start of 2017, prior to the First Surgery.   The inference that Plaintiff's admission means what it says, and that, moreover, Plaintiff's slow start began even earlier, in 2016, and continued until 2018, is supported by a number of other pieces of evidence: 1) in November and December of 2016, Magennis wrote email messages to Murphy asking for documentation of production to date; 2) Plaintiff's performance review from January 2017 offers a summary of Plaintiff's performance for 2016, with performance goals for 2017, and Plaintiff's 2016 production totals are small fractions of his 2017 performance goals; and 3) Plaintiff's performance review from January 2018 offers a summary of Plaintiff's performance for 2017, and Plaintiff's 2017 production totals are small fractions of the performance goals set for him in the performance review from January 2017.   Plaintiff has challenged none of this. No reasonable jury could hear the evidence of record and conclude that Defendants' contentions

45

about the timing and nature of Plaintiff's poor performance are in question based on the evidence.   As to the timing and nature of Plaintiff's poor performance, the evidence is entirely one-sided; the factual basis of Defendants' asserted legitimate reason for termination is unchallenged.

This leaves Plaintiff in the position of arguing that, while the factual basis of Defendants' asserted legitimate reason for termination is undisputed, the explanation is nonetheless not worthy of credence.   The Court finds that the quantum of evidence offered by Plaintiff in support of this argument barely amounts to even a scintilla.   The only evidence that Plaintiff has offered that is even remotely probative of this issue is the admission from Murphy that he told Plaintiff at his exit interview that the reason for termination was a reorganization.   That is the one piece of evidence in the entire record before this Court that indicates use of a pretext.   That is not sufficient to defeat Defendants' motion for summary judgment on the retaliation claims. The evidence is absolutely clear that, despite what Murphy said to Plaintiff at termination, Murphy believed that the real reason for the termination was poor performance, and Murphy agreed that Plaintiff's performance had been poor.   Thus, while the evidence supports the inference that Murphy used a pretext in explaining the reason for the termination to Plaintiff, there is no evidence that Murphy's pretextual statement actually reflected what Murphy believed to be the truth.

Plaintiff has offered no other evidence to support his contention that Defendants have given "shifting, contradicting rationales" for Plaintiff's termination.   To the contrary, the evidentiary record supports only a conclusion that the true rationale for Plaintiff's termination was always principally his poor performance, that Magennis consistently manifested her concern

about Plaintiff's level of performance, and the facts of Plaintiff's performance consistently

justified her concern, before, during, and after the First Surgery and the Second Surgery.   The

evidence of record is one-sided: it shows that Magennis and Murphy consistently assessed

Plaintiff via the aspect of job performance that they termed "production," quantified in three

numbers: total new loan growth, total new deposit growth, and total new fee income.   While

Murphy and Magennis may have had disagreed at times about whether Plaintiff's performance

deserved some adverse employment action, there is no evidence that they disagreed that those

production totals were the primary means for assessing Plaintiff's job performance, or that they

disagreed on what the numbers actually were.    There is no evidence that, by the time of

termination, Murphy and Magennis disagreed that Plaintiff had failed to perform or produce at

the expected levels for a long time.   There is no evidence that this assessment of Plaintiff's

performance did not have solid factual support.   Plaintiff has failed to offer evidence that could

permit a reasonable jury to conclude that this explanation is shifting, contradictory, or unworthy

of credence.[12]   Plaintiff has provided no evidence to support his assertion that the rationale for

termination is "implausible."   To the contrary, it is unchallenged.

        Plaintiff cites only one Third Circuit decision in support of his pretext case, Chipollini,

which works against him and spotlights the defect in his pretext argument.   Plaintiff's

parenthetical contends, correctly, that the Chipollini Court found that the district court erred by

---

[12] A slightly different phrasing of the application of the pretext standard at summary judgment appears in Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999): "Where the plaintiff does offer evidence that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail."   On this record, no reasonable juror would conclude that Plaintiff's evidence of pretext is more credible than the employer's justification.

overlooking evidence that challenged the factual basis of the employer's proffered reason for discharge.   Indeed, the Third Circuit stated: "The district court overlooked evidence contained in affidavits, interrogatories and depositions which can be read as challenging the defendant's factual support with respect to its proffered reasons for discharge."   Chipollini v. Spencer Gifts, 814 F.2d 893, 900 (3d Cir. 1987).   As this Court has now ruled in the instant case, that is exactly what Plaintiff failed to do here – present evidence which challenged Defendants' factual support as to the proffered reason for termination, poor performance.   Chipollini is very much on point. The factual foundation for Defendants' proffered reason here has gone unchallenged.

This Court finds that Plaintiff has failed to defeat Defendants' motion for summary judgment on his retaliation claims.   Plaintiff has failed to point to sufficient evidence to establish all elements of a *prima facie* case of retaliation.   Defendants have offered a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff has failed to offer sufficient evidence to allow a reasonable jury to conclude that this reason is a pretext for discrimination. Defendants' motion for summary judgment on Plaintiff's retaliation claims will be granted.

## CONCLUSION

This Court has before it two motions for summary judgment.   The Complaint asserts four claims against both Defendants: 1) interference with FMLA rights; 2) retaliation for FMLA leave requests; 3) interference with NJFLA rights; and 4) retaliation for NJFLA leave requests. The parties agreed that the claims under the NJFLA should be decided under the same legal standard as those under the FMLA.   Plaintiff moved for summary judgment on Count One (FMLA interference) and Count Three (NJFLA interference).   This Court concluded that Plaintiff failed to show that, as to these two claims, there is no genuine dispute as to any material

fact and he is entitled to judgment as a matter of law.   Plaintiff's motion for summary judgment will be denied.   Defendants moved for summary judgment on all four counts in the Complaint. This Court concluded that Plaintiff failed to raise any material factual disputes in opposition, that Plaintiff failed to defeat Defendants' motion, and that Defendants demonstrated, as to all claims in the Complaint, that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.   This Court has inquired "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 251-52.   This Court finds that the evidence of record is truly so one-sided that Defendants must prevail as a matter of law. Defendants' motion for summary judgment will be granted, and Judgment will be entered in Defendants' favor on all claims in the Complaint.

    s/ Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.


Dated:   December 29, 2020

49